## H. C. MAGEE AND RICH MAGEE *v.* STATE.

[54 South. 802.]

CONTEMPT PROCEEDINGS. *Evidence. Sufficiency.*

In a contempt proceeding for interfering with a decree awarding the custody of a minor child to his father and depriving the defendants of his custody, evidence that defendant gave the minor bread to eat, shelter under their roof and refused to take him back to his father's house, coupled with the fact that defendants did not entice the boy away from his father and made no effort to detain him at their home is not sufficient to warrant defendant's conviction for contempt.

APPEAL from the chancery court of Jefferson Davis county.

HON. R. E. SHEEHY, Chancellor.

The chancery court adjudged H. C. Magee and Rich Magee guilty of contempt and they appeal.

The facts are fully stated in the opinion of the court.

*McIntosh Bros.,* for appellants.

A reading of the whole record in our opinion develops the fact that appellants turned over the child voluntarily

to the custody of Pleas Walker, and because Buford would not stay with Pleas, his father, because he ran away and kept himself hid, and because appellants would not run him away from their premises, or take him by force and carry him back to appellee on his demand, the court has adjudged them guilty of contempt. We submit that the facts in the case, conceding that the original order on the *habeas corpus* proceedings was violated, did not warrant the judgment.

*Jas. R. McDowell,* assistant attorney-general, for appellee.

The whole conduct of appellants show bad faith and shows a constructive contempt of the decree of the court. The chancellor, if he wishes to enforce his orders, must punish those who disregard them.

McLAIN, C.

This is an appeal by appellants from an order of the chancery court of Jefferson Davis county, adjudging them guilty of constructive contempt of court, for violating and willfully interfering in the execution of a decree of that court, rendered on the 21st day of March, 1910, wherein it was decreed that Pleas Walker be awarded the custody and control of one Buford Walker, a boy about ten or eleven years of age. A brief history of the case may be necessary to a clear conception of the questions here involved:

Rich Magee was the father of two children, one a son by the name of H. C. Magee, one of the appellants in this case, and the other a daughter, the mother of the boy involved in this litigation. This daughter in her lifetime gave birth to a bastard son, Buford Walker. It is admitted by all parties that Pleas Walker is the father of the boy. After the death of the mother of this boy, he lived with his maternal grandfather and uncle, the two appellants here. A writ of *habeas corpus* was in-

stituted by Pleas Walker against appellant, Rich Magee, for the care and custody of the boy. On the 21st day of March, 1910, the court granted an order awarding Pleas Walker the child. Soon thereafter appellant delivered possession of the boy to Pleas Walker, who took him to his home, some six or seven miles from the home of appellants. The boy remained a few days with his father, when one night he slipped away, going back to his grandfather's and uncle's home, appellants in this case. Immediately Pleas Walker went to appellants' home, to recover possession of the boy. The grandfather freely admitted that, on the night the boy escaped from his father's home, he came direct to his house, arriving there after he had retired, and knocked upon his door for admittance, and he let the boy in, giving him a place to sleep; and he further admitted that he was there with the children out at play somewhere on the premises, and expressed a willingness for Walker to get him. As soon as the boy saw Pleas Walker, he fled. Walker made repeated efforts to get the boy, but it seems that the moment the boy discovered him, or any one else looking for him, he would take to the woods. On one occasion, a friend of Walker's got possession of the boy at a certain church, placing him in a buggy, and started with him for Walker's home; but on the way he suddenly leaped from the buggy and escaped. A short time after this, the boy left that neighborhood and went to the home of a near relative whom he knew, and pending the trial of this cause he was there living with this relative, attending school. The grandfather frankly admitted that he suffered the boy to eat at his home with his children whenever he came in with them. When threatened with prosecution for failure to produce the boy and turn him over to his father, he said in substance: "All right; if they think they can do anything with me, just go ahead. He is my grandson, and under the circumstances, I will divide what little I have got to eat with him, as long as

I have got anything to eat"—stating at the same time
that he had nothing to do with the boy being carried to
Pleas Walker's home, and that he had nothing to do in
causing the boy to run away from there, and that he
was not going to have anything to do with sending the
boy back; that he did not feel like it was his duty to
take the boy back by force, and he was not going to do so;
that the boy was as "wild as a buck," and, whenever he
saw any one from the neighborhood of Pleas Walker's,
that he would flee. Both of appellants bitterly deny that
they aided or abetted in his escape from the possession
of Walker, and that they were not then advising him to
stay away from Walker's home, and that Walker was
perfectly welcome to take him; but that they did not feel
that it was incumbent upon them to seize the boy and take
him back to Pleas Walker's, or to forcibly seize him and
hold him captive until his father could come and get him.

It is manifest from the record that the appellants
turned the boy over voluntarily to the custody of Pleas
Walker, as directed by the decree of the court; that the
boy would not remain with his father; that he ran away,
and kept himself hid from his father, or any one else
in search for him. It is also manifest that appellants
would not deny him admittance to their home, nor take
him by force to his father's. But they bitterly denied
that they aided in the escape of the boy, or that they were
then advising him to stay away from his father's. It is
equally manifest that appellants sympathized with the
boy with all their heart, and regretted that the court was
forced to give the possession of the boy to his father.
The fact that appellants, under the circumstances as re-
lated, gave him bread to eat, shelter under their roofs,
and refused to take the boy to his father's home, are not,
within themselves, sufficient facts to adjudge them guilty
of contempt. Some stress is laid on the fact that, when
appellants delivered the boy to his father, in obedience
to the decree of the court, the grandfather, in bidding

him good-bye, said: "Come back to see us whenever you want to." This was a very natural expression. Indeed, the decree of the court provided that he should be permitted to visit his relatives at times.

It is further contended that a boy of such tender years would not have plunged into the darkness of night alone to make this journey of seven miles to his grandfather's home. Barring this conjecture, there is nothing in the record that hints, or suggests, that any one accompanied him on this trip; but, on the contrary, his grandfather says that, when the boy knocked at his door late at night for admittance, he was alone. It is manifest that the boy went to his father's home against his will. His father himself, his father's home and surroundings, were strangers to him, so to speak. He doubtless longed to return to the scenes of his childhood ramblings, and to the bosom of those whom he knew and loved. He knew no other persons and no other place, and all this was dear to him and lay near his heart. Perhaps being inspired by these sacred sentiments, he was nerved to brave the darkness of the night to reach them. Be that as it may, it is manifest he had made up his mind not to stay with his father, if he could possibly avoid it. This is rather borne out by his general conduct, and especially emphasized by the fact that, when captured and placed in a buggy, as heretofore described, he leaps therefrom, making good his escape.

There are some circumstances in this case suggesting the guilt of defendants; but, taking all facts and circumstances into consideration as contained in the record, we are unwilling to affirm that there is sufficient proof to show, beyond a reasonable doubt, that defendants are guilty of the contempt as charged, and we think the case should be reversed, and the cause dismissed.

*Reversed.*

Per Curiam. The above opinion is adopted as the opinion of the court, and, for the reasons therein indicated by the commissioner, the case is reversed, and the cause dismissed.